IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **ALFALFA SOLAR I LLC, a Delaware limited liability company, et al.**,<br><br>Plaintiffs,<br><br>v.<br><br>**PORTLAND GENERAL ELECTRIC COMPANY, an Oregon Corporation**,<br><br>Defendant. | Case No. 3:18-cv-40-SI<br><br>**OPINION AND ORDER** |

Robert A. Shlachter and Keil M. Mueller, STOLL STOLL BERNE LOKTING & SHLACHTER P.C., 209 SW Oak Street, Suite 500, Portland, OR 97204. Of Attorneys for Plaintiffs.

Dallas S. DeLuca and Anit Jindal, MARKOWITZ HERBOLD P.C., 1211 SW Fifth Avenue, Suite 3000, Portland, OR 97204; Jeffrey S. Lovinger, 2000 NE 42nd Avenue, Portland, OR 97213. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

Plaintiffs are ten single-member limited liability companies in the business of generating and selling solar energy, each of which has executed a contract to sell energy to Defendant Portland General Electric ("Defendant" or "PGE"). On January 1, 2018 Plaintiffs commenced this action against Defendant seeking a declaratory judgment interpreting a disputed term that is common to each of their contracts. Before the Court is Defendant's motion to dismiss the

PAGE 1 – OPINION AND ORDER

complaint for lack of subject matter jurisdiction or, in the alternative, dismiss or stay proceedings. For the following reasons, Defendant's alternative motion is granted, and this case is stayed under the doctrine of primary jurisdiction.

## BACKGROUND

### A. Regulatory Framework

Under the Public Utility Regulatory Policies Act of 1978 ("PURPA") and rules promulgated by the Federal Energy Regulatory Commission ("FERC"), utilities must offer to purchase power from certain qualifying energy producers ("qualifying facilities" or "QFs") at established prices that are calculated in accordance with rules adopted by the FERC. 16 U.S.C. § 824a-3(b). FERC regulations require that the price reflect the utility's "avoided cost"—the cost that the utility would otherwise pay to produce the power itself. 18 C.F.R. § 292.304. FERC rules also require that utilities offer that price to QFs over a "specified term," pursuant to a "legally enforceable obligation," also referred to here as a contract or purchase price agreement ("PPA"). 18 C.F.R. § 292.304(d)(2). The price is calculated based on the utility's avoided cost at the time that the obligation is incurred, and thus may not reflect the utility's actual avoided cost over the entirety of the fixed term.

PURPA tasks the states with implementing the FERC regulations. 16 U.S.C. § 824a-3(f). The Oregon Public Utilities Commission ("PUC") is the state agency responsible for implementing FERC regulations in Oregon, which includes the "power and jurisdiction to supervise and regulate every public utility" in Oregon. ORS. 756.040(2). The PUC has authority to set the rates to be offered by a utility to QFs and establish "the terms and conditions for the purchase of energy" by utilities from QFs. ORS 758.535(2)(a). Pursuant to this authority, the PUC reviews and approves standard PPAs that PGE and other utilities offer to QFs to ensure that

such PPAs are in compliance with state and federal statutes, regulations, and policies. PPAs are not enforceable unless and until they have been approved by the PUC.

On May 13, 2005, the PUC issued an order requiring utilities to offer Standard PPAs to QFs for a term of twenty years. For the first fifteen years of that term, per the PUC order, utilities must offer established prices (referred to as the "Renewable Fixed Price Option"). The PUC permitted utilities to develop their own "Standard PPAs" implementing the requirements of the May 2005 order, subject to PUC approval.

**B. Procedural Background**

Plaintiffs are QFs that have each entered into a PPA with Defendant, which is an Oregon utility. Plaintiffs executed their respective PPAs with Defendant between January 25, 2016 and June 27, 2016. Some provisions of the "Standard PPAs" signed by the Plaintiff QFs vary, but the terms of each PPA signed by the Plaintiff QFs that are relevant to the issues raised in this lawsuit are identical. The PUC approved these Standard PPAs for use by Defendant on September 22, 2015. Each Standard PPA signed by Plaintiffs provides that the Plaintiff QF will develop a solar electric power generation facility and, upon successful construction and achievement of commercial operation, will sell one hundred percent of the net power generated by the facility to PGE. The facility that each Plaintiff QF intends to develop will not be operational until approximately three years after the date on which the Standard PPAs were executed and until then will be unable to transmit power.

The Standard PPA's Renewable Fixed Price Option provides that Defendant will pay each Plaintiff QF a fixed rate equal to Defendant's "Renewable Avoided Costs in effect at the time the agreement is executed" for all power transmitted and sold to Defendant "for a maximum term of 15 years." Upon the expiration of the 15-year term, the rate that PGE pays for the remainder of the contract will be based on a daily index price, known as the Mid-C Index Price.

PAGE 3 – OPINION AND ORDER

Plaintiffs allege that, although the Mid-C Index Price for any given day cannot be known in advance, the Mid-C Index Price will be substantially lower than Defendant's Renewable Avoided Costs at any given time.

In proceedings before the PUC involving other QFs who have signed versions of the same Standard PPA as Plaintiff QFs, Defendant has taken the position that the 15-year term begins to run on the date that the PPA is executed ("Execution Date"). In this lawsuit, Plaintiffs seek a declaration from the Court that the 15-year fixed rate term does not begin to run until the facilities are commercially operational ("Operational Date"). Because each PPA signed by the Plaintiff QFs anticipates that Plaintiffs' facilities will not be operational under three years after the Execution Date, Defendant's interpretation of the 15-year term start date results in the QFs being guaranteed the fixed Renewable Avoided Cost rate for three years fewer than if the 15-year start date begins on the Operational Date.

In a separate proceeding before the PUC (referred to here by its PUC docket number, "UM 1805"), three trade associations representing the interests of different QFs filed a complaint against Defendant, arguing that Defendant's Standard PPA violated prior PUC orders by measuring the 15-year term from the Execution Date and not the Operational Date. The PUC ruled that, because the PUC had reviewed and approved Defendant's Standard PPA, that PPA did not violate any commission order. The PUC also ruled, however, that in future Standard PPAs, Defendant should measure the 15-year period from the Operational Date and ordered Defendant to re-write its Standard PPA to comply explicitly with that policy.

After the PUC issued its order, Plaintiffs attempted to intervene in the UM 1805 proceeding, seeking an order from the PUC that the Standard PPAs actually provided that the 15-year fixed rate term starts on the Operational Date. On October 16, 2017, the PUC ruled that it

was barred by statute from granting a petition to intervene after the close of evidence, but noted that Plaintiffs could file a new complaint under ORS 756.500. The original complainants in UM 1805, meanwhile, filed an application for reconsideration or rehearing, seeking a similar order interpreting the existing Standard PPAs. In response to that application, the PUC issued a second order in UM 1805, clarifying that Defendant's Standard PPAs "*may have* limited the availability of fixed prices to the first fifteen years measured from contract execution," and that the PUC had "neither examined nor addressed the specific terms and conditions of any past QF contract," and that its resolution of the UM 1805 complaint, did "not address any existing executed contracts or [Defendant]'s current or existing standard contracts."

Rather than file a complaint before the PUC under ORS 756.500, Plaintiffs filed this action in federal court on January 8, 2018. On January 25, 2018, Defendant filed a nearly identical complaint against Plaintiffs with the PUC (referred to here by its docket number "UM 1931"). In UM 1931, Defendant seeks a declaration that, under the Standard PPA, the 15-year fixed rate term begins on the Execution Date. Plaintiffs moved to dismiss Defendant's complaint before the PUC on several grounds, including that the PUC lacks jurisdiction over the interpretation of executed PPAs. On May 23, 2018, the PUC denied Plaintiffs' motion to dismiss, finding that it "has concurrent jurisdiction over the parties and the subject matter of this dispute."

## DISCUSSION

Defendant moves to dismiss on five alternative and independent grounds. First, Defendant argues that the Court lacks subject matter jurisdiction because Plaintiffs' claim for declaratory judgment is not ripe. Alternatively, Defendant argues that the Court should exercise its discretion to dismiss Plaintiffs' claim under (1) the doctrine of primary jurisdiction; (2) the doctrine of administrative exhaustion; (3) the Court's inherent discretion to decline to issue a declaratory ruling; and (4) the *Burford* abstention doctrine. For reasons that follow, Plaintiffs'

PAGE 5 – OPINION AND ORDER

claim is ripe and the Court has subject matter jurisdiction over this action. Plaintiffs' claim, however, should be stayed under the primary jurisdiction doctrine. Because Defendant's motion is properly resolved under the doctrine of primary jurisdiction, the Court declines to address the remaining bases on which Defendant urges the Court to exercise its discretion to dismiss or stay this action.

## A. Ripeness

"The requirement that a case or controversy exists under the Declaratory Judgment Act is 'identical to Article III's constitutional case or controversy requirement.'" *Principal Life Ins. Co. v. Robinson*, 394 F.3d 665, 669 (9th Cir. 2005) (quoting *American States Ins. Co. v. Kearns*, 15 F.3d 142, 143 (9th Cir. 1994). "[T]he appropriate standard for determining ripeness of private party contract disputes is the traditional ripeness standard, namely, whether there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id*. at 671 (internal quotation marks omitted). Defendant, however, urges this court to apply the more stringent test for "prudential ripeness," which is applied in certain cases involving administrative agencies in recognition "that judicial action should be restrained when other political branches have acted or will act." *Id* at 670. The prudential ripeness test looks at two factors: "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Nat'l Park Hosp. Ass'n v. Dept. Interior*, 538 U.S. 803, 808 (2003).

### 1. Appropriate Ripeness Doctrine

The Ninth Circuit has explicitly held that the prudential ripeness doctrine does not apply to disputes between private parties. *Principal Life*, 394 F.3d at 671. Defendant nevertheless argues that, because this case involves entanglement in administrative proceedings and issues of policy that may implicate other QFs not party to this lawsuit that have similar terms in their

PAGE 6 – OPINION AND ORDER

PPA's, prudential ripeness is an appropriate test. Given the clarity of the *Principal Life* holding, the Court has considerable doubt that the prudential ripeness doctrine applies to this dispute, which is between private parties, albeit in a heavily regulated context. The need for the disputed term to be interpreted uniformly among the many contracts in which is appears is not relevant to ripeness analysis, but rather primary jurisdiction. The prudential ripeness doctrine exists, rather, "to prevent the courts . . . from entangling themselves in abstract disagreement *over administrative policies*." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967) (emphasis added). Plaintiffs here do not challenge an abstract administrative policy made by the PUC, but rather a concrete and specific—though potentially ambiguous—contract term. Nevertheless, because Plaintiffs' claim is ripe under either the constitutional or prudential ripeness test, the court assumes, without deciding, that the more stringent prudential ripeness test applies.

   2. Application

      a. Fit for judicial decision

"The purpose of the 'fitness' test under *Abbott* is to delay consideration of the issue until the pertinent facts have been well-developed in cases where further factual development would aid the court's consideration." *In re Coleman*, 560 F.3d 1000, 1009 (9th Cir. 2009). The facts of this dispute have been fully developed and do not, as Defendant contends, depend on contingent future events. No future facts can develop that would shed light on whether the disputed term, as written in the PPA, is ambiguous and, if it is, what the parties intended the term to mean at the time the contract was executed.

In *California Energy Resources Conservation & Development Commission v. Johnson*, the Ninth Circuit dismissed a challenge to a provision in an energy sales agreement—one that had never been relied upon and was not expected to be relied upon—that set rate ceilings for certain customers. 807 F. 2d 1456, 1461 (9th Cir. 1986). The plaintiffs asked the Court to declare

PAGE 7 – OPINION AND ORDER

those ceilings unlawful in violation of a particular statutory cost-effectiveness principle. The court held that the dispute was not ripe because its resolution would require it to adjudicate the legality of a hypothetical event, something "[c]ourts have no business" doing. *Id*. at 1463 (quoting *National Wildlife Federation v. Goldschmidt*, 677 F.2d 259, 263 (2d Cir. 1982) (internal quotation marks omitted). In this case, however, the Court is not asked to adjudicate the legality of a non-event, but to declare the meaning of an actually disputed term. Unlike the rate ceilings in *California Energy*, which had never been used and were unlikely ever to be used, there is no question that the end of the fixed rate term will arrive at some point. The purpose of the contract, and in particular the provision for a fixed rate term, is to create a degree of certainty on fixed rates and the present uncertainty created by the alleged ambiguity renders the dispute non-hypothetical. The other cases cited by Defendant similarly involve hypothetical conflicts and are thus not persuasive.

### b. Hardship

Plaintiffs allege that, in order to obtain the financing necessary to meet their contractual obligations—e.g., develop, construct, and operate the facilities—they must know whether they will received the fixed rate for fifteen years after their facilities become operational, or only twelve. Plaintiffs argue that the uncertainty of the fixed rate term increases financing costs and may make it impossible to obtain financing at all. Such allegations are sufficient to show that Plaintiffs will experience hardness if adjudication of this dispute is delayed. In *In re Coleman*, a bankruptcy court's delay in reaching a decision regarding a debtor's "undue hardship" would result in the debtor making several years of burdensome repayments without certainty as to whether her debt would ultimately be discharged. 560 F.3d at 1010. The Ninth Circuit held that such uncertainty was a sufficient hardship to recommend an immediate decision under the prudential ripeness doctrine. *Id.* at 1011. Here, too, the uncertainty created by the disputed term

PAGE 8 – OPINION AND ORDER

and the increased financing costs attendant to that uncertainty, as alleged by Plaintiffs and assumed to be true at this stage in the litigation, are sufficient to establish that Plaintiffs will face hardship if resolution of their claim is delayed. Because Plaintiffs' claim is fit for judicial decision and Plaintiffs face hardship if resolution is delayed, the claim is ripe and subject to the Court's subject matter jurisdiction.

**B. Primary Jurisdiction**

Defendant further argues that the Court should exercise its discretion to decline to hear this case under the doctrine of primary jurisdiction. "[T]he doctrine of primary jurisdiction is committed to the sound discretion of the court when 'protection of the integrity of a regulatory scheme dictates preliminary resort to the agency which administers the scheme.'" *Syntek Semiconductor Co. v. Microchip Tech. Inc.*, 307 F.3d 775, 781 (9th Cir. 2002) (quoting *United States v. General Dynamics Corp.*, 828 F.2d 1356, 1362 (9th Cir. 1987). Courts in the Ninth Circuit consider four factors when deciding whether to defer to an agency: "(1) the need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory authority that (4) requires expertise or uniformity in administration." *Id.* Oregon state courts use a similar test to determine whether an agency has primary jurisdiction over disputes that fall within the agency's statutory authority, considering (1) the agency's expertise in the issue, (2) the need for uniform resolution of the issue, and (3) whether judicial resolution will interfere with the agency's ability to perform its regulatory responsibilities. *Boise Cascade Corp. v. Bd. of Forestry*, 325 Or. 185, 192 (1997). The Ninth Circuit has not yet determined whether state or federal primary jurisdiction doctrine applies in diversity suits. Because "the general primary jurisdiction principles announced by Oregon courts do not materially differ from those found in federal cases," *Verizon Nw. Inc. v. Portland Gen. Elec. Co.*,

PAGE 9 – OPINION AND ORDER

2004 WL 97615 at *5, n.2 (D. Or. Jan. 13, 2004), the doctrines can be considered simultaneously.

Resolution of this case necessarily requires interpretation of a PPA term that was approved by the PUC, and there is little question that PURPA, FERC regulations and Oregon regulations subject utilities, and their contractual relationships with QFs, to a comprehensive regulatory scheme overseen by the PUC. There is thus little question that the first and third federal primary jurisdiction factors are met, and that they generally—but not conclusively—recommend deferring to the PUC's primary jurisdiction. Whether the Court should exercise its discretion not to hear this case thus turns on (1) whether Congress or the Oregon legislature has placed questions of the interpretation of an executed PPA within the PUC's jurisdiction and (2) the extent to which the interpretation of the relevant PPA term requires the PUC's expertise or uniformity in administration.

**1. The PUC's federal or state statutory authority to interpret executed PPAs**

Defendant argues that state commissions' authority under PURPA to implement FERC regulations translates into the authority to interpret PPA provisions that were approved by a state commission, and drafted to comply with that commission's previous orders. Plaintiffs respond that, after a PPA has been executed, it is a contract between private parties like any other, subject to common law principles of contract interpretation, and the PUC no longer has jurisdiction over its interpretation. Neither side is entirely correct. Although executed PPAs are subject to traditional principles of contract interpretation, and state commissions may not exercise ongoing "utility-type regulation" over an executed PPA, the Oregon PUC is nevertheless authorized to hear this dispute.

States have broad rate-making authority under PURPA and its implementing regulations. *See, e.g., Indep. Energy Producers Ass'n, Inc. v. California Pub. Utilities Comm'n*, 36 F.3d 848,

856 (9th Cir. 1994) ("[T]he states play the primary role in calculating avoided costs and in overseeing the contractual relationship between QFs and utilities operating under the regulations promulgated by the [FERC]."); *see also Administrative Determination*, IV Federal Energy Reg. Comm'n Rep. (CCH) ¶ 32,457 at 32,173 (stating that the FERC "afford[ed] the states ... a great deal of flexibility both in the manner in which avoided costs are estimated and in the nature of the contractual relationship between utility and QF"). Both the Oregon Court of Appeals and the Ninth Circuit, however, have held that state utility commissions do not have authority to modify rates or other terms established in contracts between utilities and QFs after those contracts have been executed.

In *Independent Energy*, the plaintiffs challenged a California Public Utilities Commission ("CPUC") program that permitted utilities to pay QFs a rate lower than the avoided cost rate specified in the contract if the CPUC determined that the QF no longer qualified under PURPA as a QF due to decreased efficiency. The Ninth Circuit's core holding was that the authority to determine whether a QF meets the PURPA requirements is exclusively federal, and that so long as the QF was certified as such by the FERC, it was entitled to be paid the full avoided cost rate. In response, the utility and CPUC argued that the program did not authorize the CPUC to make QF determinations, but merely imposed an "alternative" avoided cost rate to reflect the QF's decreased efficiency. *Id.* at 857. The Ninth Circuit rejected this characterization of the program as well, observing that the "underlying motivation" of the rate adjustment program was to lower the avoided cost rates specified in the contract because those rates were higher than the utility's *current* avoided cost rate. That the locked-in contract price ended up being higher than the utility's actual avoided cost rate, however, did "not give the state and the [u]tilities the right unilaterally to modify the terms of the standard offer contract." *Id.* at 858. Under FERC

PAGE 11 – OPINION AND ORDER

regulations, "QFs are entitled to deliver energy to utilities at an avoided cost rate calculated *at the time the contract is signed.*" *Id.* (emphasis added). When significant differentials between contract avoided cost rates and current avoided cost rates exist, the Ninth Circuit noted, "the proper remedy . . . is to ensure that future standard offer contracts contain more flexible pricing mechanisms." *Id.*

In *Oregon Trail Elec. Consumers Coop, Inc. v. Co-Gen Co*, the Oregon Court of Appeals was asked to interpret a contract that had originally existed between a QF and a utility, but that had been assumed by a different QF and a non-utility. 168 Or. App. 466, 468-69 (2000). Because the utility's successor-in-interest to the contract was a non-utility that was not subject to the PUC's authority, the case did not implicate the primary jurisdiction doctrine. *Id.* at 474 n.6 ("Where no agency has or retains jurisdiction over the dispute—as the parties agree is the case here—there is no reason for a court to 'refrain' from exercising its jurisdiction."). Interpretation of the contract nevertheless required the Oregon Court of Appeals to determine whether the PUC had authority to modify contracted rates, because the disputed term provided that the fixed rates were subject to modification only "to the extent" that the PUC had authority to modify fixed contract rates.[1] The Court of Appeals held that the contract rates could not be modified because "PURPA precludes a regulator's exercise of post-contractual, utility-type price modification authority." *Id.* at 482.

Some state agencies have interpreted PURPA's "contract non-interference policy" as also depriving those agencies of jurisdiction to interpret agreements. *See, e.g., Crossroads Cogeneration Corp. v. Orange & Rockland Utilities, Inc.*, 159 F.3d 129, 138 (3rd Cir. 1998)

---

[1] The contract had been drafted when PURPA was a relatively new law and the breadth of the state utility commissions' ratemaking and other regulatory authority was unsettled. *Oregon Trail*, 168 Or. App. at 471.

(describing an order from the New York Public Service Commission in which the commission declared itself to have authority to interpret its orders approving contracts, but not to interpret the executed contracts themselves); *see also Idaho Power Co. v. Cogeneration, Inc.*, 129 Idaho 46, 48 (1996) (describing an Idaho Public Utilities Commission order in which the commission declined to exercise jurisdiction over the interpretation of a *force majeure* clause, finding the state district court to be a "more appropriate forum" for such an issue). The Oregon PUC, however, has asserted that it has both the "expertise and the authority to review the terms and conditions of the contract developed at the [PUC]." *Portland General Electric Co. v. Pacific Northwest Solar, LLC*, PUC Docket No. UM 1894, Order No. 18-025 at 6 (Jan. 25, 2018). Most relevant to this case, on May 23, 2018, the PUC issued an order declining to dismiss Defendant's complaint in UM 1931, and concluding that it has primary jurisdiction over this dispute. *Portland General electric co. v. Alfalfa Solar I LLC, et al*, Docket No. UM 1931, Order No. 18-174 at 4-5 (May 23, 2018).

Although the PUC's assertion of its own jurisdiction over the interpretation of PPAs is not itself conclusive, the Oregon PUC's conclusion that it may exercise jurisdiction over executed contract disputes, despite PURPA's ban on executed PPA modification, is correct. As a preliminary matter, PURPA's ban on executed PPA modification by state agencies does not necessarily deprive those agencies of authority to interpret terms in executed PPAs using traditional common law interpretive methods. Any court of common law, for example, is empowered to interpret contractual terms or otherwise declare the rights and liabilities of parties to a contract, but the same court generally lacks the equitable power to modify the terms of a contract. PURPA thus places no greater limits on state agencies' ability to regulate the terms of a utility contract after it has been executed than it does on this Court.

PAGE 13 – OPINION AND ORDER

Further, although PURPA is silent as to whether the state agencies are empowered to interpret executed PPAs, Oregon law has placed such disputes within the PUC's statutory authority. The plain text of ORS 756.500 places no clear limits on the kinds of complaints that may be filed before the PUC. Paragraph three provides that "[t]he complaint shall state all grounds of complaint on which the complainant seeks relief *or the violation of any law* claimed to have been committed by the defendant," ORS 756.500(3) (emphasis added). This phrasing indicates that the PUC is not limited to hearing claims based on violations of statutes, regulations or commission orders, but can also hear complaints based on other grounds, such as contract claims. Paragraph five of the same section further provides that "any public utility or telecommunications utility may make complaint as to *any matter* affecting its own rates or service . . ." ORS 756.500(5) (emphasis added). The interpretation of a contractual term that sets the period over which a fixed rate must be offered is a matter that affects a utility's rates and services, and "'any' means 'any.'" *Brem-Air Disposal v. Cohen*, 156 F.3d 1002, 1004 (9th Cir. 1998) ("A statute that allows *any* person to sue *any* other person for any violation of *any* of the statute's requirements means precisely what it says."). The Oregon legislature thus appears to have authorized the PUC to hear claims related to the interpretation of executed PPAs. Perhaps most relevant, in this case, is that Plaintiff has consented to the PUC's jurisdiction. Paragraph 17 of Plaintiffs' PPA provides that "[t]his Agreement is subject to the jurisdiction of those governmental agencies having control over either Party or this Agreement." Thus, even if Plaintiff QFs were to object to the PUC's "control over" themselves, because there is no question that the PUC "has control over" Defendant, Plaintiffs have consented to both the personal and subject matter jurisdiction of the PUC for disputes arising from their executed PPA with Defendant.

### 2. The PUC's expertise and the need for uniformity.

Defendant argues that interpreting the PPA term at issue here "implicates agency expertise on issues of administrative law" and that "correct interpretation requires review of a series of [PUC] orders and policy decisions and [Defendant]'s drafting of various provisions in response to those orders and decisions." To the extent that the PUC's previous orders approving the terms of the PPA are relevant to the interpretation of an executed PPA, "they are relevant only in the context of the understanding of the parties as reflected in an objective reading of the agreement and its approval." *Crossroads*, 159 F.3d at 139. Thus, although the PUC may have a certain expertise in understanding what policy decisions and orders were publically available, and thus potentially relevant to the parties' understanding of the agreement, "[a]n inquiry into the issues focused on by the [PUC] and its staff as reflected in its internal records is not relevant." *Id.*

In this case, the parties agree that previous PUC orders are relevant to the proper interpretation of the contract. During oral argument, Plaintiffs cited PUC Order No. 05-584, Order No. 17-256, and Order No. 18-079, arguing that each of these orders supports Plaintiffs' interpretation of the disputed PPA term. Defendant responded that Plaintiffs were selectively and misleadingly quoting those orders. Thus, the parties, at least, agree that PUC orders are relevant to the parties' understanding of the contract when it was signed, but disagree as to *how* they are relevant. The PUC, as the body that wrote and issued those orders, is better positioned than this Court to evaluate the content of these orders and their relevance to this dispute. Consideration of the PUC's expertise thus supports a conclusion that the PUC is the preferred forum.

This case also implicates the need for uniformity in interpreting a provision that is common to many existing PPAs. Defendant asserts that the disputed provision appears in at least 72 executed PPAs. A trade group representing QFs has already challenged the precise term

PAGE 15 – OPINION AND ORDER

that Plaintiffs challenge in this case in a complaint before the PUC. *Northwest and Intermountain Power Producers Coalition et al v. PGE*, Docket No. UM 1805, Order No. 18-079 (Mar. 5, 2018). The PUC has not issued an interpretive opinion only because the previous challenge did not require an interpretation of the PPA, but only interpretation of its previous orders. *Id.* at 3. The PUC emphasized in its most recent order in UM 1805, however, that it "stand[s] ready to interpret individual standard contract forms." *Id.* For this Court to issue an opinion interpreting the disputed "15-year" provision in this action while the PUC exercises concurrent jurisdiction over identical claims would interfere with the PUC's ability to uniformly regulate the contractual relationship between QFs and utilities. Were the PUC and this Court to reach different conclusions regarding the start date of the 15-year fixed rate term, moreover, it would result in a race to either the courthouse or commission by all parties to PPAs containing the disputed term as the parties jockey for their preferred forum.

Balanced against the PUC's expertise and the need for uniformity is Plaintiffs' need for a speedy resolution of this dispute, which may be adversely affected if the Court defers to the PUC's primary jurisdiction. Plaintiffs contend that the uncertainty regarding the disputed term in the PPA has caused ongoing disruption in their attempts to obtain financing to develop their facilities. Defendant could delay final resolution of this dispute before the PUC by resisting Plaintiffs' attempts to obtain a speedy resolution and by collaterally attacking any PUC decision that Defendant finds unfavorable by renewing this dispute in state or federal court. During oral argument on this motion, however, Defendant represented to the Court that Defendant would not oppose Plaintiffs' motion for expedited consideration by the PUC, and further agreed not to collaterally attack any fubak decision announced in this dispute by the PUC. The risk that proceedings before the PUC would result in unfair delay for Plaintiffs is therefore considerably

mitigated. Given the PUC's expertise in evaluating the contents and relevance of its previous orders to the parties' understanding of the PPA, the need for the disputed term to be interpreted uniformly, and the reduced risk of delay causing further harm to Plaintiff, it is appropriate for the Court to defer to the PUC's primary jurisdiction over this case. Because the Court has subject matter jurisdiction over Plaintiffs' claim, dismissal is not mandatory. The Court therefore exercises its discretion to stay the proceedings pending resolution of PUC Docket No. UM 1931.

## CONCLUSION

Defendant's Motion to Dismiss (ECF 20) is GRANTED IN PART. This action is stayed pending resolution of PUC Docket No. UM 1931. The parties are directed jointly to inform the Court of a final decision in UM 1931 no later than 30 days after the PUC issues such decision.

**IT IS SO ORDERED**.

DATED this 31st day of May, 2018.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge